STATE OF NORTH CAROLINA
COUNTY OF FORSYTH

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 25CVS2466

STANLEY SOMERVILLE and MICHAEL GENWRIGHT, *on behalf of himself and all others similarly situated,*

Plaintiffs,

v.

QUALITY OIL COMPANY, LLC, and RELIABLE TANK LINE, LLC,

Defendants.

**CLASS ACTION COMPLAINT**
**(JURY TRIAL DEMANDED)**

---

Plaintiffs Stanley Somerville and Michael Genwright ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendants Quality Oil Company, LLC ("Quality Oil") and Reliable Tank Line, LLC ("Reliable Tank Line") (collectively "Defendants"), alleging and stating as follows:

## I. INTRODUCTION

1. For at least 10 years, Defendants conspired to intentionally sell and deliver fuel that was contaminated to fuel stations throughout North Carolina.

2. This contaminated fuel was then unknowingly purchased by consumers, including the Plaintiffs.

3. Defendants' scheme generally worked as follows:

   a. Occasionally, fuel at stations would become contaminated through situations such as accidental unloading of the wrong fuel into a tank at the station or from rainwater leaking into the tank. Such contaminated fuel is referred to as "nonconforming."

b. When fuel becomes nonconforming, Defendants pump out the nonconforming fuel and bring it back to various properties owned or operated by Defendants (usually referred to as "terminals"), where it is stored in tanks on the property.

c. Defendants then engage in a scheme in which they use their drivers to top off fuel deliveries to fuel stations with hundreds of gallons of the nonconforming fuel.

d. This leads to situations where consumers purchasing fuels such as unleaded 87 octane at a fuel station may in fact be buying unleaded 87 octane that also includes diesel fuel, water, farm grade diesel fuel, or other substances that are not unleaded 87 octane.

4. When different fuel products are mixed with one another, the State of North Carolina has strict regulations—all under supervision of the Gasoline and Oil Inspection Board's Director. *See* 02 NCAC 42 .0601–.0602.

5. Upon discovery of motor fuel's "nonconformity," North Carolina law requires sealing "all outlets to" the contaminated tank; and "the motor fuel shall not be removed or disposed of" until the owner of the fuel seeks out and completes the proper remedy. 02 NCAC 42 .0601.

6. Proper remedies include the owner of the contaminated gasoline properly blending the fuel to meet the registered specifications either within the current container or after removing the contaminated product. 02 NCAC .0602(a)–(b).

7. However, any gasoline that has been "sealed by the gasoline and oil inspectors … shall not be offered or exposed for sale until the Director of the Gasoline and Oil Inspection Division [is] fully satisfied that the gasoline…has been blended or rerefined or properly labeled to

meet the requirements" of North Carolina law, "and the owners of said gasoline have been notified in writing of this fact by [the] Director." N.C.G.S. § 119-27.

8. Rather than going through this regulated process, Defendants return and store the improperly mixed fuel in tank trailers on their various properties. At their Winston-Salem terminal for example, they hide these trailers mostly out of sight behind their corporate offices. Defendants then redistribute that nonconforming fuel to stations throughout the state without re-refining or properly blending the contaminated fuel in accordance with North Carolina's statutory framework to restore it to the required specifications.

9. Plaintiffs initiated this action to recover costs associated with the purchase of contaminated gasoline as well as all other statutory damages, penalties, and amounts they and all other similarly situated individuals are entitled to because of Defendants' unlawful provision of contaminated fuel to consumers in North Carolina.

## II. THE PARTIES

10. Plaintiff Somerville is a citizen and resident of Morganton, Burke County, North Carolina and is neither an infant, incompetent, nor in the military service of the United States of America.

11. Plaintiff Genwright is a citizen and resident of Lenoir, Caldwell County, North Carolina and is neither an infant, incompetent, nor in the military service of the United States of America.

12. Defendant Quality Oil is a limited liability company organized and existing under the laws of North Carolina, with its principal place of business located at 1540 Silas Creek Parkway, in Winston-Salem, Forsyth County, North Carolina.

13. Defendant Quality Oil describes its principal business to be "retail [and] wholesale distribution of petroleum products," including gasoline.[1]

14. Defendant Reliable Tank Line is a limited liability company organized and existing under the laws of North Carolina, with its principal place of business also located at 1540 Silas Creek Parkway, in Winston-Salem, Forsyth County, North Carolina.

15. Defendant Reliable Tank Line describes its principal business to be the "transportation of petroleum products," including gasoline.[2]

16. At all times relevant to this action, Defendants engaged in acts or practices in their ordinary course of business which affected commerce within the meaning of the Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1 ("UDTPA").

17. Upon information and belief, Defendants are the agents and alter egos of each other, and their respective and combined corporate interests have been amalgamated so that they in effect operate as one and the same entity. Therefore, with respect to all actions and decisions relevant to this action, Defendants have operated as one entity, including in the practice of consolidating and subsequently distributing contaminated motor fuels.

18. Upon information and belief, the finances, policies, and business practices of each Defendant are (and were, at all relevant times) dominated and controlled by one another in such a manner that neither Defendant has a separate mind, will, identity, or existence of its own, instead operating as mere instrumentalities and alter egos of one another.

19. Defendants are so closely related in ownership and management, and work so closely in concert that each has become the alter ego of the other. For example:

a. Defendants share the same registered agent;

---

[1] *See* Quality Oil Co., Inc. Annual Report for 2023 (attached as Exhibit A).
[2] *See* Reliable Tank Line, LLC, Annual Report for 2023 (attached as Exhibit B).

b. Defendants share the same principal office location;

c. Defendants share company officials with one another;

d. Defendants share the same history, "core ideology," and values;[3] and

e. Employees of both Defendants are paid by Defendant Quality Oil.

20. Accordingly, any conduct of one Defendant deemed to be in violation of North Carolina law should be imputed to the other Defendant as well.

## III. JURISDICTION & VENUE

21. Plaintiff Somerville is a natural person and resident of Buncombe County, North Carolina; a substantial portion of the violations giving rise to this action occurred in North Carolina; and both Defendants are registered to do business in North Carolina and conduct considerable business within North Carolina.

22. This Court has subject matter jurisdiction pursuant to N.C.G.S. §§ 7A-240 and 7A-243.

23. This Court has personal jurisdiction in this matter pursuant to N.C.G.S. § 1-75.4.

24. Venue is proper under N.C.G.S. § 1-79. Each Defendant maintains places of business and conducts substantial business activities in Forsyth County, and has done so during the entire relevant time period.

## IV. FACTUAL ALLEGATIONS.

### A. The Process of Fuel Delivery in North Carolina.

25. There are well over 8,000,000 vehicles registered in North Carolina, at least 7,700,300 of which are gasoline-powered.[4]

---

[3] *See generally* Quality Oil, *Company History*, https://qualityoilnc.com/history/ (last accessed Jul. 10, 2024); *see also* Reliable Tank Line, *Home Page*, https://reliabletankline.com/ (last accessed Jul. 10, 2024) (Defendant Reliable Tank Line was originally founded as "Quality Oil Transport").

[4] https://afdc.energy.gov/vehicle-registration (last accessed Sept. 3, 2024).

26. When the drivers of these vehicles need to fill up their tanks, they go to a fuel station of their choosing, select a specific type of fuel, and pump that fuel into their fuel tank.

27. The fuel a consumer is pumping into his/her vehicle comes from an underground storage tank on the fuel station's property. But to get the fuel to a fuel station's underground tank(s), so that a consumer can in fact pump it into his/her vehicle, a station typically contracts with a fuel supplier.

28. Defendants are fuel suppliers, responsible for delivering fuel to fuel stations throughout the State.

29. Fuel suppliers, such as Defendants, in turn send empty tanker trucks to fill up at terminals throughout the state, in places such as Greensboro, Selma, and Charlotte.

30. Those terminals often have many large tanks, capable of collectively holding millions of gallons of fuel.

31. For instance, below is a picture of some of the tanks at a terminal in Greensboro that each have capacity of approximately 52,000 gallons of fuel:



32. Fuel suppliers such as Defendants bring their empty tankers to these terminals to be filled up with specific fuel, that then often has specific additives added to it based on where the fuel is being delivered. For instance, Shell has specific additives in its gasoline that make an engine cleaner and more fuel-efficient.[5] Where a fuel supplier delivers fuel to a fuel station selling Shell gasoline, the supplier would come to the terminal, get the specific grade of gasoline it needs to deliver, and have Shell's additives added to that gasoline as well.

33. The fuel supplier would then travel to the fuel station it wanted to deliver gas to and pump that fuel into an underground storage tank at the fuel station.

**B. North Carolina's Regulation of Motor Fuel Quality.**

34. North Carolina directs significant resources to monitoring fuel products sold to consumers within the State and has instituted multiple means by which it regulates such products—including the establishment of administrative bodies and the enactment of statutes and regulations—all designed to ensure consumers in North Carolina may purchase safe and reliable gasoline that actually is what it purports to be.

35. First, Chapter 119 of the North Carolina General Statutes governs "Gasoline and Oil Inspection and Regulation," and includes laws regarding, *inter alia*, the marketing, labeling, transportation, distribution, and sale of motor fuels within North Carolina.

36. North Carolina adopts the American Society for Testing and Material ("ASTM") D 4814 "Standard Specification for Automotive Spark-Ignition Engine Fuel". *See* 02 N.C. Admin. Code 42 .0201. This standard specification describes the various characteristics and requirements of automotive fuels and requires fuel sold in North Carolina to meet those characteristics and requirements.

[5] https://www.shell.us/motorist/shell-fuels/shell-gasoline.html (last accessed Sept. 3, 2024).

37. Fuel sold by fuel suppliers in North Carolina are required to be of the quality specification registered with the Director of the Standards Division of the North Carolina Department of Agriculture and Consumer Services.

38. N.C.G.S. § 119-7 prohibits the "sale of automobile fuels and lubricants by deception as to quality," stating that "[i]t shall be unlawful for any person [or entity] to store, sell, offer, or expose for sale any liquid fuels…in any manner whatsoever which may deceive, tend to deceive, or have the effect of deceiving the purchaser" of the fuel "as to [its] nature, quality or quantity."

39. N.C.G.S. § 119-27 states:

> Any person, firm, partnership, or corporation who shall **offer or expose for sale** gasoline from any dispensing pump or other dispensing device which has not been labeled as required…and/or **offer and expose for sale any gasoline which does not meet the required standard for the grade indicated on the label** attached to the dispensing pump or other dispensing device, shall be guilty of a Class 2 misdemeanor, and the gasoline…shall be confiscated.

40. Furthermore, the contaminated gasoline must be confiscated and sealed until North Carolina's Director of the Gasoline and Oil Inspection Division informs the owners of said gasoline in writing that the State's requirements have been met. *Id.*

41. Moreover, under the North Carolina Administrative Code, "[w]henever a motor fuel fails to conform with its registered specifications, all outlets to the container or tank shall be sealed, and the motor fuel shall not be removed or disposed of except as provided" within the Code. 02 NCAC 42 .0601.

42. The Code also provides several remedies and solutions for owners of tainted motor fuel, provided that the process is supervised by the Director of the Standards Division of the North

Carolina Department of Agriculture and Consumer Services and is found to be in accordance with N.C.G.S § 119-27, including that:

a. The owner may "add a registered motor fuel of such quantity and quality to the condemned motor fuel to cause [the condemned fuel's] quality specifications…to conform to its registered specifications so that [it] may be offered for sale, sold, or delivered[;]" or

b. "The owner may remove the condemned motor fuel from its container and blend it with a registered motor fuel so that the quality specifications of the blended motor fuel conform to…the quality specifications of the [fuel] with which it was blended." 02 NCAC 42 .0602(a)–(b).

43. However, as described *infra*, when met with the problem of noncompliant fuel, Defendants implement neither of these solutions and therefore do not comply with North Carolina law.

**C. Defendants' Covert and Improper Fuel-Mixing Operations.**

44. Defendants' businesses operate as a singular entity, which opens the door for opportunities to cut costs by disregarding the laws noted above.

45. Among other commercial activities, Defendant Quality Oil operates as a fuel retailer with its own "Quality Mart," "Quality Plus," and "GoGas" service stations, and as a wholesaler of petroleum products distributing gasoline to other stations to sell to consumers.[6]

46. Defendant Reliable Tank Line is a common carrier that transports petroleum products to businesses across the Southeastern United States.[7] Defendant Reliable Tank Line touts

---

[6] *See generally* Quality Oil Co., *Stations*, https://qualityoilnc.com/stations/ (last accessed Jul. 10, 2024); and *About: Mission/Vision*, https://qualityoilnc.com/mission/ (last accessed Jul. 10, 2024).
[7] *See* Reliable Tank Line, *About RTL*, https://reliabletankline.com/about-rtl/ (last accessed Jul. 10, 2024).

its "extensive training and safety program," which purportedly "ensures that [it is] taking every effort to eliminate product mixes."[8]

47. Although Defendants have "over 90 years of petroleum experience" in transport, wholesale, and retail;[9] and though they own all their own transport and distribution equipment, "take pride in properly maintaining every tractor and trailer," and employ "the most cutting-edge technology in every new truck,"[10] improper dumps and deliveries of fuel are sometimes unavoidable and contamination issues arise even under ideal circumstances.

48. Critical to this case, however, is what happens after the fuel is found to be contaminated—instead of following the proper procedure under North Carolina law, Defendants have continuously conspired together to distribute contaminated fuel throughout North Carolina without properly cleaning, refining, or blending it in accordance with North Carolina regulations.

49. Whenever contamination occurs in the underground tanks at a station Defendants supply fuel to, Defendants pump all of the contaminated materials out of the fuel station tanks. That collected fuel is then delivered back to a terminal owned by Defendants, often the Silas Creek Parkway property shared by Defendants in Winston-Salem, where it is then emptied into semi-truck tankers (the "Storage Tankers") that are parked on the Defendants' properties.

50. These Storage Tankers are filled with a mixture of different contaminated fuels, and the Defendants do not keep track of the breakdown of the mixtures in any given tank, only keeping track of the cumulative amount of gallons stored in each tank.

---

[8] *See* Reliable Tank Line, *For Customers*, https://reliabletankline.com/customers/ (last accessed Jul. 10, 2024).

[9] https://qualityoilnc.com/dealers/

[10] Reliable Tank Line, *For Drivers: Safety, Training, & Equipment*, https://reliabletankline.com/safety-training-equipment/ (last accessed Jul. 10, 2024).

51. To get rid of the contaminated fuel in the Storage Tankers, Defendants then require some of their drivers to fill some of their semi-truck tankers with this contaminated fuel when they are making deliveries to fuel stations.

52. Typically, Defendants will have the driver first fill up a portion of their semi-truck tankers at a terminal like the one in Greensboro, and then stop by one of the Defendants' terminals, often the Silas Creek Parkway property, to add contaminated fuel before making a delivery to a fuel station.

53. When mixing the contaminated fuel with the unadulterated fuel, Defendants make no effort to measure the specific mixtures of fuel, nor to otherwise ensure any sort of compliance with the applicable regulations for blending the fuel types.

54. The Defendants' drivers proceed to deliver the contaminated fuel wherever they are instructed.

55. Defendants make no effort to determine exactly what the mixture of fuel being delivered actually is, nor to determine that it is consistent with the quality specifications of the fuel with which it was blended.

56. Defendants have no corporate procedures for properly cleaning contaminated tanks of fuel. Instead, it is Defendants' policy or practice to dispose of contaminated fuel by improperly mixing it with their other deliveries of uncontaminated fuel offered for sale to North Carolina consumers to avoid spending time and money on a re-refining process. Defendants' practices utterly fail to comply with the requirements of N.C.G.S § 119-27.

**D. Example of the Unlawful Process.**

57. As an example of the unlawful process, on November 28, 2023, Defendants had several Storage Tankers with contaminated fuel at the Silas Creek Parkway property shared by Defendants in Winston-Salem.

58. One such Storage Tanker was labeled as tanker-trailer "2056" ("Trailer 2056").

59. Upon information and belief, on November 28, 2023, Trailer 2056 contained contaminated, mixed fuel.

60. That contaminated fuel had been collected from a fuel station known as Go Gas #4.

61. A true and accurate photograph of Trailer 2056 on November 28, 2023, with the contaminated fuel inside is below:




62. Upon information and belief, in the early morning November 28, 2023, one of Defendants' drivers filled a tanker-trailer labeled "2031" ("Trailer 2031") with fuel from a fuel terminal owned and run by Colonial Pipeline Company located at 6395 Burnt Poplar Road, and

was scheduled to deliver that fuel to, *inter alia*, the Carbon City Quality Plus consumer gas station located at 225 Carbon City Road in Morganton, North Carolina 28655.

63. The Carbon City Quality Plus gas station is owned and operated by Defendants.

64. Defendants' Silas Creek Parkway property in Winston-Salem was located on the route between the Greensboro terminal and the Carbon City Quality Plus gas station in Morganton, North Carolina.

65. Upon information and belief, the driver of Trailer 2031 was told by Defendants' agent to stop by the Silas Creek Parkway property to top off his tanks with contaminated fuel on his way to the Carbon City Quality Plus on August 28, 2023.

66. At approximately 7:49 a.m. on November 28, 2023, the driver of Trailer 2031 returned to the Silas Creek Parkway property from the Colonial Pipeline Company. A true and accurate photograph of Trailer 2031 arriving to Defendants' property is below:




67. At approximately 9:26 a.m. on November 28, 2023, the driver of Trailer 2031 parked next to Trailer 2056, which contained the contaminated fuel. A true and accurate photograph of Trailer 2031 parked next to Trailer 2056 is below:




68. Shortly after Trailer 2031 parked next to Trailer 2056, the driver of Trailer 2031 proceeded to transfer quantities of the contaminated fuel from Trailer 2056 into Trailer 2031.

69. A true and accurate photograph of the driver of Trailer 2031 watching the contaminated fuel being loaded into Trailer 2031 is below:




70. At approximately 9:43 a.m., the driver of Trailer 2031 departed the Silas Creek Parkway property and began driving towards the Carbon City Quality Plus consumer gas station.

71. Trailer 2031 arrived to the Carbon City Quality Plus at approximately 11:22 a.m. Over the next half hour or so, the driver of Trailer 2031 emptied the contaminated fuel into the various underground storage tanks of the Carbon City Quality Plus. A true and accurate photograph of the driver of Trailer 2031 watching the contaminated fuel filling up the underground tanks at the Carbon City Quality Plus is included below:




72. Upon information and belief, on November 28, 2023, the driver of Trailer 2031 provided over 1,000 gallons of contaminated fuel to the Carbon City Quality Plus consumer gas station.

73. At the moment this contaminated fuel was emptied into the various tanks of the Carbon City Quality Plus, all fuel in the underground storage tanks immediately became unfit for public use and consumption.

74. Upon information and belief, all of the contaminated fuel was purchased by consumers.

**E. Plaintiffs' Purchase of Defendants' Contaminated Gasoline.**

75. On November 29, 2023, Plaintiff Somerville purchased approximately five gallons of regular-grade gasoline for a total of $15.00 for his GMC Yukon at the Carbon City Quality Plus gas station. A true and accurate photograph of Plaintiff Somerville as he prepared to fill his vehicle with contaminated fuel is included below:




76. At the time that this gasoline was purchased and used by Plaintiff Somerville, he was unaware that it was contaminated.

77. The gasoline that Plaintiff Somerville purchased was contaminated by Defendant Quality Oil and transported to the Carbon City Quality Plus gas station by Defendant Reliable Tank Line on November 28, 2023, as outlined above.

78. On November 29, 2023, Plaintiff Genwright purchased regular grade gasoline for his Isuzu Rodeo at the Carbon City Quality Plus gas station. A true and accurate photograph of Plaintiff Genwright as he prepared to fill his vehicle with contaminated fuel is included below:




79. At the time that this gasoline was purchased and utilized by Plaintiff Genwright, he was unaware that it was contaminated.

80. The gasoline that Plaintiff Genwright purchased was contaminated by Defendant Quality Oil and transported to the Carbon City Quality Plus gas station by Defendant Reliable Tank Line on November 28, 2023, as outlined above.

81. The gasoline that the Plaintiffs purchased was contaminated.

82. The gasoline that the Plaintiffs purchased was not fit for public use or consumption.

83. Neither Plaintiff, nor any reasonable consumer, had any reason to know, suspect, or expect that the gasoline purchased from or distributed by Defendants was contaminated.

84. Reasonable consumers, including the Plaintiffs, who were purchasing the gasoline for use by themselves and their families, bear in mind the presence or risk of contamination in their gasoline when considering whether to purchase from Defendants.

85. Accordingly, the Plaintiffs would not have purchased the gasoline but for Defendants' omissions and misrepresentations.

86. The Plaintiffs would not have purchased the gasoline had they been aware that it was contaminated as outlined herein.

87. Defendants are aware that their customers trust that the fuel they deliver meets the specifications required by State law, and would not expect their fuel to contain or have a material risk of containing a mixture of contaminated fuel.

88. Defendants further know that reasonable consumers would not knowingly use fuel products that contain harmful contaminants that could cause damage to their vehicle, including potentially disabling their vehicle on dangerous roadways.

89. Defendants capitalized and reaped enormous profits from reasonable consumers like the Plaintiffs.

90. Defendants' contaminated fuel is dangerous, not fit for use by vehicles, unlawful, and, in fact, prohibited from being sold at all, rendering the fuel worthless.

91. Moreover, even if there were some monetary value in the fuel, which Plaintiffs deny, reasonable consumers, including Plaintiffs, paid more for the contaminated fuel than they would have had they known the truth the contamination.

## V. ESTOPPEL FROM PLEADING CERTAIN DEFENSES

92. Due to the nature of Defendants' wrongful acts and omissions as alleged in this Complaint, Defendants are estopped from pleading defenses derived from any relevant statute of limitation, statute of repose, limitation, or disclaimer.

### A. Defendants are Estopped from Pleading Statutes of Limitation and Repose.

93. Defendants knew or reasonably should have known that, with respect to the gasoline purchased by the Plaintiffs and the Class Members, they exposed for sale motor fuel that did not comply with applicable laws and regulations. At the times of the sales, Defendants

intentionally concealed that material information from the Plaintiffs, Class Members, and the general public.

94. Defendants affirmatively concealed the contaminated nature of the fuel they distributed by failing to clean the product and the tanks properly; instead mixing all the non-conforming material together and storing it in trailer tanks until it was used to top off fuel deliveries to retail gas stations.

95. Defendants' concealment of the true nature of their fuel, along with the affirmative representations that the fuel was of a certain quality and grade, constitutes fraud.

96. The Plaintiffs and Class Members reasonably relied on Defendants' representations about the quality of the fuel and had no feasible means of discovering that the fuel was contaminated.

**B. Defendants are Estopped from Pleading Limitations and Disclaimers.**

97. By virtue of their wrongful acts and omissions, Defendants' distribution of contaminated fuel throughout North Carolina has conformed to Defendants' marketing, advertising, and representations regarding their products and services.

98. Given the defective condition of the fuel purchased by Plaintiffs and Class Members, Defendants have not provided the value bargained for, nor that compared to other fuel products available in the State.

99. Defendants knew or should have known that distributing fuel contaminated with improper materials violates the applicable North Carolina and regulations and would result in a failure to provide fuel in accordance with the advertisements, marketing materials, and representations made by Defendants, as well as the reasonable expectations of ordinary consumers, including the Plaintiffs and Class Members.

## VI. CLASS ALLEGATIONS

100. Pursuant to the common law of North Carolina and Rule 23 of the North Carolina Rules of Civil Procedure, Plaintiffs bring this action both individually and as a proposed class action against Defendants on behalf of themselves and all other similarly situated persons in North Carolina (the "Class"), particularly defined as follows:

> All persons and entities that purchased contaminated fuel sold by Quality Oil and/or distributed by Reliable Tank Line at a fuel station located in North Carolina during the four-year period prior to the filing of the complaint in this action through the present.

101. Plaintiffs propose that the Class be divided into subclasses if and as necessary to align Class Members' interests; thus, Plaintiffs reserves all rights to redefine the Class prior to or contemporaneously with moving for class certification in this action.

102. Expressly excluded from the Class are: (1) any Judge presiding over this action and members of their families; (2) each Defendant and any entity in which each Defendant has a controlling interest, or which have a controlling interest in any Defendant, and Defendants' current and former employees, investors, members, and officers; and (3) all persons who properly execute and file a timely request for exclusion from the Class.

103. Plaintiffs further allege and states that, pursuant to Rule 23 of the North Carolina Rules of Civil Procedure:

a. The class is so numerous that joinder of all members is impracticable;

b. There are questions of law and fact common to the class;

c. The claims of Plaintiffs are typical of the class;

d. The common issues predominate over any individual issues;

e. Plaintiffs will fairly and adequately protect the interest of the class; and

f. A class action is superior to other available methods.

104. ***Numerosity*:** Members of the Class are so numerous that their individual joinder is impracticable. While the precise number is unknown at this time, upon information and belief, the proposed Class is composed of hundreds, if not thousands, of persons and/or entities that bought contaminated fuel from at least 130 gas stations geographically dispersed throughout North Carolina. Moreover, the persons and entities fitting the Class definition will be easily ascertainable and identifiable from a review of Defendants' business records regarding when and where deliveries of contaminated gasoline took place.

105. ***Commonality*:** Questions of law and fact common to the members of the Class predominate over questions affecting only individual members. Defendants have acted on grounds generally applicable to the Class. Class certification is appropriate under North Carolina law because Defendants engaged in a uniform and common practice vis-à-vis each Class member. The contaminated fuel distributed by Defendants and purchased by Plaintiff and the resultant damages are common among Class Members. The critical questions common to the Class that will materially advance the litigation are: (a) whether the Defendants sold and distributed contaminated fuel that—contrary to their representations and legal obligations—did not comply with North Carolina laws and regulations; and (b) and whether the Class Members purchased tainted fuel from a fuel station that was offering Defendants' tainted product. All Class members have the same legal right to, and interest in, redress for damages associated with their purchase of the contaminated gasoline.

106. ***Typicality*:** Plaintiffs' claims are typical of the claims of the members of the Class, as all such claims arise out of Defendants' wrongful conduct in supplying, distributing, and selling contaminated fuel to Class Members.

107. ***Adequate Representation***: Plaintiffs will fairly and adequately protect the interests of the Class, and he have no interests antagonistic to those of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex litigation, including consumer fraud class actions.

108. ***Predominance and Superiority***: This class action is appropriate for certification because questions of law and fact common to the Class Members predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the class is impracticable. If individual Class members are required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system, while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties, while providing unitary adjudication, economies of scale, and comprehensive supervision by a single Court. Moreover, there is no unusual difficulty in managing this action as a class action.

109. As a direct and proximate result of Defendants' wrongful cost-cutting operation to sell and distribute fuel that did not meet the qualifications and standards they represented it did, Plaintiffs and the Class have incurred damages by purchasing the contaminated fuel and putting it into their vehicles. Compensation will be necessary to place Plaintiffs and the Class Members in the same position they would have been in but for the Defendants' acts or omissions.

## VII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, N.C.G.S. § 75-1.1 *et seq.*

110. The foregoing allegations are incorporated by reference and realleged herein.

111. The UDTPA makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C.G.S. § 75-1.1.

112. Defendants engaged in deceptive practices in the conduct of their trade or commerce, and their deceptive trade practices significantly affected the public interest by selling, delivering, and otherwise distributing contaminated, unsafe fuel products to locations and consumers throughout North Carolina, including Plaintiffs and Class Members.

113. Defendants' acts and omissions in failing to disclose that their products were or had a material risk of being contaminated, as described *supra*, amount to a material misrepresentation made with the intent to induce consumers, like Plaintiffs and the Class, to purchase the motor fuel from Defendants.

114. Defendants (and their agents) knew or should have known that the product they were distributing was contaminated; and that the fuel did not comply with North Carolina law and regulation.

115. Under the applicable law, explained *supra*, it is unlawful to sell or expose fuel for sale that is deceptive as to its quality, and the fuel must meet the standard indicated on the pump. N.C.G.S. § 119-7; 119-27.

116. Here, Defendants deliberately sold and distributed fuel that did not comply with the applicable laws and regulations throughout North Carolina.

117. Though they chose to affirmatively represent their fuel as compliant with the state standards, Defendants knew they were selling and distributing a product that did not meet the applicable standards for fuel.

118. As a result, the fuel sold and distributed by Defendants did not match the standard advertised and did not match the standard that was reasonably expected by Plaintiffs and Class Members who purchased it.

119. Knowingly distributing contaminated fuel in such a manner constitutes an unfair and deceptive act by Defendants in violation of N.C.G.S. § 75-1.1.

120. Ultimate purchasers of the fuel, including Plaintiffs and the Class, were misled about the quality and value of the product they purchased.

121. Defendants intended that Plaintiffs and Class Members would rely on their misrepresentations, concealment, deceptions, and omissions regarding the grade of their fuel. Defendants had no intention for anyone, let alone consumers like Plaintiffs and Class Members, would discover the contaminated nature of their product.

122. Any reasonable consumer, including Plaintiffs and the Class, would consider the fuel's contamination to be a material fact important to deciding where to purchase fuel their vehicles and what price they were willing to pay.

123. Plaintiffs and the Class Members would have negotiated a lower price or simply avoided the inferior product altogether by purchasing fuel elsewhere had they known—and had Defendants disclosed and not concealed—that the fuel they purchased did not comply with the laws and regulations of North Carolina.

124. Upon information and belief, Defendants' unlawful conduct has continued, with no indication that it will cease.

125. As a direct and proximate result of Defendants' unfair, deceptive, and unconscionable commercial practices, Plaintiffs and the Class Members have been damaged in an

amount in excess of $25,000.00; and are entitled to recover treble damages as well as attorneys' fees and costs pursuant to the UDTPA, N.C.G.S. § 75-16.

## SECOND CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

126. The foregoing allegations are incorporated by reference and realleged herein.

127. As alleged *supra*, Defendants made material representations and omissions to consumers, including Plaintiffs and Class Members, by claiming the fuel it exposed for sale was of a certain quality. Those representations were false.

128. Additionally, Defendants caused these false representations and omissions to be made to consumers by gas stations selling their product. Defendants knew or should have known that the gas stations selling their tainted product relied—and intended for Plaintiffs and the Class Members to rely—on the represented fuel quality.

129. When Defendants made these false representations and/or caused them to be made, Defendants knew or should have known that the fuel was contaminated and was therefore inferior to the standard it was marketed to meet, in violation of North Carolina law.

130. Defendants knew or should have known that consumers, including Plaintiffs and the Class, were relying on the representations of the fuel grade, standard, or quality noted at the pumps when making their purchases.

131. Plaintiffs and Class Members could not have discovered Defendants' misrepresentations upon the exercise of reasonable inquiry; and they reasonably relied upon Defendants' representations that their fuel was accurately presented for sale as being of marketable quality, as required by North Carolina laws and regulations.

132. In reliance upon Defendants' material representations, Plaintiffs and Class Members paid full price for fuel below the grade they intended to purchase.

133. As a result, Plaintiffs and Class Members suffered economic and other losses because the fuel was contaminated, low-quality, and harmful.

134. Had Plaintiffs and the Class known the truth about the fuel sold and distributed by Defendants, they would not have purchased the fuel for their vehicles.

135. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs and the Class have suffered, and continue to suffer, financial damage and injury; and are entitled to all damages, including punitive damages, in addition to attorneys' fees, costs, and interest, as allowed by law.

**THIRD CAUSE OF ACTION**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTIBILITY,**
**N.C.G.S. § 25-2-314**

136. The foregoing allegations are incorporated by reference and realleged herein.

137. At all relevant times, Defendants have been merchants and suppliers of fuel.

138. At all relevant times, Defendants were responsible for the quality and grade of the fuel it sold and distributed throughout North Carolina.

139. As merchants, Defendants impliedly warranted to the gas stations selling its products and the general public, including Plaintiffs and Class Members, that its fuel met certain specification standards.

140. However, as described *supra*, Defendants' fuel was <u>not</u> as warranted—they sold and distributed contaminated fuel that did not conform to the grade on the product's label at the gas pump, in violation of N.C.G.S. § 25-2-314(2)(f).

141. As a result, Defendants' actions and omissions breached the implied warranty of merchantability under North Carolina law; and any attempts by Defendants to waive or disclaim this warranty were not conspicuous or are otherwise unenforceable.

142. As a direct and proximate result of the breach of the implied warranty of merchantability, Plaintiffs and the Class suffered and will continue to suffer loss, as alleged *supra*, in an amount to be determined at trial, in excess of $25,000.00

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**

143. The foregoing allegations are incorporated by reference and realleged herein.

144. At all relevant times, Defendants consciously sold and distributed their worthless, contaminated fuel throughout North Carolina, charging full price from consumers and/or gas stations.

145. Substantial benefits have been conferred on Defendants by Plaintiffs and Class Members through their purchase of the contaminated fuel. Defendants knowingly and willingly accepted and enjoyed these benefits.

146. Defendants either knew or should have known that the payments rendered by Plaintiffs were given and received with the expectation that the fuel would be sold as warranted, with the appropriate quality, standard, or grade.

147. Defendants were obligated to disclose the true characteristics of the fuel because:

a. Defendants had exclusive knowledge of the true nature of the fuel that was not known nor reasonably accessible to Plaintiffs and the Class; and

b. Defendants actively concealed the presence of contamination from Plaintiffs and the Class.

148. No contract existed between Defendants and Plaintiffs, nor Defendants and the Class. Instead, Plaintiffs and Class Members conferred benefits on Defendants by unknowingly paying full price for fuel that did not meet the bargained-for quality, standard, or grade. These benefits were <u>not</u> conferred gratuitously.

149. Thus, Defendants' product was worthless, yet Defendants retained the benefit of full-price payments[11] from consumers, including Plaintiffs and the Class.

150. Defendants' acceptance and retention of the benefits of the payments from Plaintiffs and the Class make it inequitable for Defendants to retain the benefits without payment of the value to Plaintiffs and the members of the Class.

151. Plaintiffs and the Class are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest.

152. Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

**FIFTH CAUSE OF ACTION**
**NEGLIGENCE PER SE**

153. The foregoing allegations are incorporated by reference and realleged herein.

154. Defendants are in the business of selling and/or offering for sale liquid motor fuel and are therefore subject to the North Carolina law prohibiting the "sale of automobile fuels and lubricants by deception as to quality." N.C.G.S. § 119-7.

155. Further, because Defendants are in the business of selling and/or offering for sale liquid motor fuel, they are also subject to the North Carolina law requiring that all gasoline sold must meet the standard indicated on the label of the pump. *See* N.C.G.S. § 119-27.

156. Defendants' acts and omissions as to the nature and quality of the fuel they sell and/or distribute throughout North Carolina deceive all purchasers. Defendants failed to disclose the true quality of their fuel.

[11] As a note, as to Class Members who purchased Defendants' contaminated fuel from a gas station that Defendants do not own, Defendants still retained the "full price" of payment they would have received if the fuel were sold as warranted.

157. Because of their scheme to dump contaminated fuel without properly blending or cleaning it, Defendants have sold and/or exposed for sale fuel that did not match the quality indicated at dispensing pumps used by North Carolina consumers, including Plaintiffs and the Class Members.

158. Plaintiffs and the Class Members unknowingly purchased an entirely different product than what was offered by Defendants.

159. Sections 119-7 and 119-27 of the North Carolina General Statutes impose a duty on those selling and/or offering for sale liquid motor fuel to ensure the quality of the fuel sold matches what the consumer is purchasing and introducing to his or her car.

160. This duty is designed for the protection of others.

161. Indeed, the bill that led to the enactment of N.C.G.S. § 119-27 in 1937 included a purpose section stating: "to the end that the public may be protected in the quality of petroleum products it buys, that the State's revenue may be protected, and that frauds, substitutions, adulterations and other reprehensible practices may be prevented."

162. As purchasers of Defendants' nonconforming gasoline, Plaintiffs and the Class Members fall within the group of persons the statute was designed to protect.

163. Plaintiffs' and the Class Members' harm—unknowingly purchasing contaminated motor fuel and introducing it to their vehicles to the vehicle's detriment—is the type of harm these statutes seek to prevent.

164. Defendants' violations of N.C.G.S. §§ 119-7 and 119-27 proximately caused Plaintiffs' and the Class Members' injuries.

## SIXTH CAUSE OF ACTION
## CIVIL CONSPIRACY

165. The foregoing allegations are incorporated by reference and realleged herein.

166. Defendants Quality Oil and Reliable Tank Line conspired a scheme intended to accomplish an unlawful purpose through concerted action.

167. At all times relevant, there existed a conspiracy between Defendants to intentionally sell and deliver contaminated fuel to service stations throughout North Carolina.

168. Defendants Quality Oil and Reliable Tank Line shared a common plan to cut costs by ignoring North Carolina law on the quality and accuracy of fuel sales.

169. Quality Oil and Reliable Tank Line were aware of the common scheme and agreed to participate in the plan. Both Defendants committed overt acts in furtherance of the conspiracy.

170. Quality Oil committed acts in furtherance of the conspiracy including, but not limited to, tracking and storing contaminated fuel; ignoring North Carolina regulation on the proper process for cleaning, refining, or blending contaminated fuel; directing tanker drivers to the service stations that will receive the contaminated fuel; and providing retail options for the sale of the contaminated fuel, such as its "Quality Mart," "Quality Plus," and "GoGas" service stations.

171. Reliable Tank Line committed acts in furtherance of the conspiracy including, but not limited to, providing drivers and trucks to pick up the contaminated fuel from the Silas Creek Parkway property and Defendants' other terminals, failing to analyze or determine the quality of the fuel being pumped into its trucks; and delivering the contaminated fuel to service stations throughout North Carolina.

172. As a direct, proximate, and foreseeable result of Defendants' acts, Plaintiffs and the Class Members have suffered damages from unknowingly purchasing contaminated fuel for their motor vehicles.

173. Defendants Quality Oil and Reliable Tank Line acted fraudulently and willfully in executing this conspiracy, and therefore, Plaintiffs and Class Members are entitled to punitive damages.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court:

a. Certify the Class pursuant to Rule 23, appoint Plaintiffs as Class Representatives, and appoint Plaintiffs' undersigned counsel as Class Counsel;

b. Enter an award for compensatory damages sustained by Plaintiffs and the Class in an amount to be proven at trial;

c. Treble the actual damages awarded to Plaintiffs and each Class Member in accordance with the UDTPA, N.C.G.S. §75-1.16;

d. Enter an award of pre-judgment and post-judgment interest, as provided by statue and law;

e. Enter an award of attorneys' fees, expenses, and costs pursuant to the applicable law;

f. Enter an order for payment of costs of suit herein incurred;

g. Grant Plaintiffs and the Class leave to amend this Class Action Complaint (and any further amended complaints to be hereafter filed) to conform to the evidence produced in discovery or at trial;

h. Allow a trial by jury on all issues so triable; and

i. Grant Plaintiffs and the class members such other and further relief as the Court deems just and proper.

Respectfully submitted, this the 9th day of April 2025.

/s/ Jeremy Williams
Matthew E. Lee
N.C. Bar No. 35405
Jeremy R. Williams
N.C. Bar No. 48162
Eric G. Steber
N.C. Bar No. 54999
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
900 W Morgan St
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5035
mlee@milberg.com
jwilliams@milberg.com
esteber@milberg.com

Edward H. Maginnis
N.C. Bar No. 39317
Karl S. Gwaltney
N.C. State Bar No. 45118
7706 Six Forks Road, Suite 101
Raleigh, North Carolina 27615
**MAGINNIS HOWARD**
Tel: 919-526-0450
Fax: 919-882-8763
emaginnis@carolinalaw.com
kgwaltney@carolinalaw.com

*Counsel for Plaintiffs and the Putative Class*